961 A.2d 752 (2008)
404 N.J. Super. 309
PARADISE PARK HOMEOWNERS ASSOCIATION, INC., a corporation of the State of New Jersey; Loretta Dibble, President of the Paradise Park Homeowners Association and owner of 32 Paradise Park, Highlands, N.J.; Francis Wolzein and Dawn Wolzein, owners of 30 Paradise Park; Francis Gorman, formerly the owner of 31 Paradise Park; and Mary Ince, formerly the owner of 48 Paradise Park, Plaintiffs-Appellants,
v.
RIVERDALE MANAGEMENT ASSOCIATES, a partnership of the State of New Jersey; Donald E. Somers, General Partner of Riverdale Management Associates; Lisa McGuire, General Partner of Riverdale Management Associates; Jeff Somers, General Partner of Riverdale Management Associates; Navesink Capital Partners, LLC, a limited liability company of the State of New Jersey, James Bollerman, individually and in his official capacity with Navesink Capital Partners, LLC, Defendants-Respondents, and
Martin Barger, Esq., an attorney-at-law of the State of New Jersey; Gary Edelson, a suspended attorney-at-law of the State of New Jersey;[1] and Nationwide Property Transfer Services, LLC, a limited liability company of the State of New Jersey, Defendants, and
Sandy Hook Developers, LLC, a limited liability company of the State of New Jersey, Defendant/Intervenor-Respondent.
DOCKET NO. A-5593-06T1
Superior Court of New Jersey, Appellate Division.
Argued October 23, 2008.
Decided December 24, 2008.
*754 William H. Eaton, Atlantic Highlands, argued the cause for appellants (Korona, Beides & Eaton, attorneys; Mr. Eaton, on the brief).
Christopher J. Hanlon, argued the cause for respondents Riverdale Management Associates, Donald E. Somers, Jeff Somers and Lisa McGuire (Hanlon & Niemann, attorneys, Freehold; Mr. Hanlon, on the brief).
Donald M. Lomurro, Freehold, argued the cause for respondents Navesink Capital Partners, James Bollerman and intervenor-respondent Sandy Hook Developers (Lomurro, Davison, Eastman & Munoz, attorneys; Michael J. Fasano, on the brief).
Before Judges WINKELSTEIN, FUENTES and GILROY.
The opinion of the court was delivered by
FUENTES, J.A.D.
Plaintiff Paradise Park Homeowners Association, Inc. ("the Association"), is a New Jersey corporation formed to represent the residents of the Paradise Park mobile home park ("the Park") located in the Borough of Highlands, New Jersey. The individually named plaintiffs, Loretta Dibble, Francis Wolzein, Dawn Wolzein, Francis Gorman, and Mary Ince, are owners or former owners of mobile homes situated on leased lands within the Park. The Association was formed in accordance with the Mobile Home Protection Act ("the Act"), N.J.S.A. 46:8C-2 to -21. Under certain circumstances, the Act grants mobile home park residents a right to certain notices triggered by the sale of the property, and a concomitant right of first refusal. N.J.S.A. 46:8C-11; N.J.S.A. 46:8C-12.
Defendants Donald E. Somers, his daughter Lisa McGuire, and his son Jeff Somers are general partners of Riverdale Management Associates ("Riverdale Management"). This group owned the Park until March 2005 when they sold it to defendant James Bollerman and his company Navesink Capital Partners, LLC ("Navesink Capital").
Defendants did not notify plaintiffs of the sale as required by the Act because they asserted that the sale fell under the Act's exemption contained in N.J.S.A. 46:8C-13(a), that is, any sale "not made in contemplation of changing the property to a use or uses other than as a private residential leasehold community."
Plaintiffs commenced this action seeking enforcement of their right of first refusal under the Act, specific performance, to quiet title, and other related remedies. Before engaging in extensive discovery, both parties moved for summary judgment, arguing that the case was ripe for *755 disposition as a matter of law. The trial court agreed. After hearing oral argument, the judge granted defendants' motion and dismissed the complaint. The court held that plaintiffs had not established that the sale was made "in contemplation" of changing the use of the property as a mobile home park.
Plaintiffs now appeal, arguing that the trial court erroneously limited the focus of its analysis to the terms of the contract for sale, thereby ignoring a plethora of evidence showing defendants' true state of mind. Specifically, plaintiffs argue that the trial court should have considered Bollerman's conduct during contract negotiations in light of his attempts to change the property's zoning scheme to permit high-end residential development. According to plaintiffs, this, together with Somers's refusal to modify the contract to reflect the buyers' true future intent, amounted to clear evidence that the sale was made "in contemplation" of changing the property's use as a mobile home park.
Defendants argue that the trial court correctly found that plaintiffs' alleged evidence concerning the parties' conduct during pre-contract negotiations amounted to nothing more than mere speculation. Under these circumstances, defendants' assert that the trial court properly found that the terms of the contract were the best indicator of the parties' state of mind.
Thus framed, we are required to determine whether the sale of this mobile home park triggered the rights conferred by the Legislature to residents of these communities in N.J.S.A. 46:8C-11 or N.J.S.A. 46:8C-12. As a corollary to this analysis, we are also required to determine whether defendants are entitled to invoke the exemption outlined in N.J.S.A. 46:8C-13(a) as a complete defense to plaintiffs' action.
We now hold that summary judgment in favor of defendants and against plaintiffs was improvidently granted. In adopting the Mobile Home Protection Act, the Legislature intended to protect the continuation of mobile home communities, and to promote and encourage ownership and self-governance by the residents of these communities. Toward that end, when an owner of a mobile home park decides to sell, or receives a bona fide offer to buy, the residents of mobile home communities are statutorily entitled to a right of first refusal. N.J.S.A. 46:8C-11; N.J.S.A. 46:8C-12.
Under N.J.S.A. 46:8C-13(a), a seller may claim that the transaction is exempt from this statutory scheme because the sale was not made "in contemplation" of changing the use of the property as a mobile home community. We now define the term "in contemplation" of changing the use as denoting a state of mind involving less commitment to action than would an "intent" to change the use. In this context, we further hold that a seller invoking such an exemption must have a rational, good faith basis to believe, under all of the attendant circumstances, that the sale was not made "in contemplation" of changing the use of the property.
Based on the evidence presented to the trial court, we are satisfied that a rational factfinder could find that Somers, as the seller, did not have a good faith basis to invoke the exemption in N.J.S.A. 46:8C-13(a). We thus reverse the trial court's grant of summary judgment and remand.

I
Paradise Park is located at the foot of Locust Street, between the Sandy Hook Bay Marina and the Borough of Atlantic Highlands. As of 2004, the Park totaled approximately 3.776 acres, and contained fifty-eight existing spaces for mobile homes and three "stick-built" homes, for a *756 total of sixty-one housing units. The property has been used as a mobile home park for more than fifty years.
Somers purchased the Park property in March 1972 through a wholly owned corporation named Oakland Service Company ("Oakland"). Oakland transferred title to the property to Riverdale Management in 2000 "for tax reasons." According to Somers, although his son and daughter assisted him in operating the property, "they relied upon my management decisions related to both the operation of the mobile home park, and the sale of the mobile home park."
At all times relevant to this case, Bollerman was the President of Bollerman Real Estate Services, and the managing partner of Sandy Hook Developers and Navesink Capital Partners.[2] On June 10, 2003, Sandy Hook Developers purchased approximately 7.3 acres of land known as 1 Willow Street in Highlands (the marina property) from Robert Aragon for $4,000,000. This property included the Sandy Hook Bay Marina and a restaurant, directly adjoining the Park property.
Sometime in 2004, Bollerman came to Somers's office to discuss a real estate matter unrelated to this case. During casual conversation, both men mentioned their respective ownership interests in the marina property and the adjacent mobile home park property. According to Somers, "[w]e then talked about the sale of [the mobile home park] and I told him my demand. He never met it." Bollerman's recollection of this first meeting corroborated Somers's account of the events. According to Bollerman, "[i]f anything was said about the purchase of the trailer park property, it was a passing comment which certainly was not the focus of our meeting."

A
About the same time, Bollerman became aware that sections of the mobile home property encroached onto the marina property. After ascertaining the magnitude of the encroachment, Bollerman attempted several times to bring the encroachment to Somers's attention with the hope of resolving this problem amicably. Despite these efforts, Somers did not take action to rectify that situation.
On October 10, 2003, Sandy Hook Developers filed a five-count complaint against Riverdale Management asserting encroachment and trespass upon the marina property. The complaint alleged that Riverdale Management: (1) was renting portions of the marina property land to its mobile home trailer owners as parking spaces; (2) had wrongly granted an easement over marina property to the local electrical utility company in order to provide electrical service to the Park's residents; and (3) had directly, or through its predecessor in title, added fill to the marina property in the mid-1990s, thus causing damage and deterioration to the property.
After joinder of issue, Sandy Hook Developers filed a motion for summary judgment against Riverdale Management. In a certification submitted in opposition to the summary judgment motion, although disputing the accuracy and sufficiency of the evidence against him, Somers conceded that "two small sheds behind the boat repair shop" encroached upon Bollerman's property. He concluded by arguing that "if any encroachments are established," he had acquired legal title to such lands under the doctrine of adverse possession.
*757 On June 23, 2004, the court granted Sandy Hook Developers' motion for summary judgment. The court limited the remedy afforded Sandy Hook Developers to injunctive relief, directing Riverdale Management to "remove all encroachments of the Defendant, its tenants, agents[,] servants or employees" from the marina property within sixty days of the date of the order. All remaining issues, including any award of monetary damages, were transferred to the Law Division.
Based on these legal developments, Bollerman acknowledged that he could now bargain with Somers to acquire the mobile home park from a position of strength. He thus instructed his attorney to explore settlement options with Somers that specifically included the purchase of the Park property. He made this point clear in his certification submitted in this case in opposition to plaintiffs' motion for summary judgment.
It was at that time I directed [former attorney] Gary Edelson to explore options to settle the matter by way of a purchase of the Paradise trailer park property. I came to realize at that time that it was virtually impossible for Donald Somers to comply with the Court Order. By that time, we had a very clear focus on the extent of the encroachments on the property. There were many encroachments and some were very substantial, even the power lines supplying the property with power, ran off of poles which had been illegally placed on property owned by Sandy Hook [Developers]. Mr. Somers would have had to incur staggering expense to relocate all of the encroachments on his property, if, indeed, it was possible at all.

....

I knew that Mr. Somers was in a virtually impossible position, and, quite frankly, saw it as a potential opportunity to purchase property and clean up a mess on an adjacent property that effected [sic] my investment in Sandy Hook Bay Marina. I also had a concern that Mr. Somers may devise a solution that would exacerbate a bad situation. (Emphasis added.)

B
The Borough of Highlands began revising its master plan in 2002. According to the master plan published in the Borough's official website:
[T]he Borough created a Master Plan subcommittee comprised of residents and individuals representing the following groups: Township Council, Planning Board and the Economic Development Committee. The Master Plan subcommittee was in charge of directing the Smart Growth Plan process.
The Subcommittee and the Planning Board [were] charged with creating a future vision for the Borough and building consensus to implement the Plan. This Master Plan provides a long-term guide for the Borough's future and stresses positive and pro-active cooperation among residents, business owners, and the Borough to achieve the objectives of the Plan. The Plan serves as a policy statement and provides framework for the Borough's implementation ordinances.
[The Borough of Highlands Master Plan, http://www.highlandsnj.us/index.htm]
On June 4, 2004, Somers wrote a letter to the Highlands Planning Board, intending that it be accepted in lieu of his formal testimony.[3] In this letter, Somers identified *758 himself as the owner of the Park. He notes that "the trailer park [began] over 50 years ago," when trailers were mostly eight feet wide. The Park spaces are thus configured to accommodate these now outmoded trailers. The modern fourteen-foot-wide mobile homes do not fit well into the existing layout.
Under the then prevailing zoning requirements for front, rear, and side yard clearances, only fifteen or sixteen modern mobile homes could fit on the site. According to Somers, it had become necessary to apply to the Zoning Board of Adjustment for a variance whenever a mobile home was replaced. Arguing that the site's mobile home use had become obsolete, Somers asserted that the park, as presently constituted, would not be able to accommodate the modern mobile homes sold in today's market.
Somers thus urged the Board to re-zone the park property to permit the development of single-family type homes. In so doing, Somers made the following statements about the potential development of the site, and the resulting benefits to the municipality:
The property was zoned Waterfront Commercial until 10-12 years ago when it was changed to MH (mobile-home). I am requesting that you advocate re-zoning the property to permit single-family town homes. My conversations with several developers indicate that a property of this size would comfortably yield 45-50 very desirable single family (2BR) homes as opposed to the current 61. How would this benefit the Highlands?
1. The density issue with all of its "baggage" is reduced if you desire.
2. No increase in Municipal services, Police, water, sewer, first aid etc.
3. Esthetically, you will have great improvement over the existing "arrangement" of 20 to 40yr old mobile-homes, some of which are poorly maintained. The Park owner has little to say over this.
4. This proposal shall cost the Boro virtually nothing, will increase the tax base considerably and will enhance the value of all adjacent area property owners.
5. The Boro collects no taxes on mobile-homes. They are specifically exempt under the State Statute. That does not apply to town homes, of course. This rezoning will provide a permanent and reliable higher tax base. I suspect there will also be some building fees.
Somers noted the "very serious State laws long in effect that govern the closing/conversion of Mobile-home parks." He added that residents of these parks had "the most protected type of tenancy in New Jersey." Any potential relocation expenses would thus be "provided for at no cost" to the municipality.
In his certification in support of his motion for summary judgment, Somers asserted that, at the time he submitted this letter to the Planning Board, he did not have any oral or written understanding or agreement with Bollerman because he was in the midst of the litigation instituted by Bollerman concerning the alleged encroachment. He certified that he wrote the letter in response to a newspaper story about the Planning Board reviewing the master plan, thinking that rezoning his property might benefit himself and the town. He claimed that the letter was thus "not related to any sale of the property."
On June 10, 2004, six days after the date of this letter, the Planning Board held a public hearing at which Bollerman testified under oath. According to Dibble's certification, Bollerman testified about "redevelopment plans." Conversely, Bollerman claimed that his appearance was not related *759 to any application for development. He was simply invited to testify as a local property owner to discuss the master plan.[4]
It is undisputed that both Bollerman and Somers sought "zoning flexibility" for the property. As the minutes of the Planning Board reflect:
Paradise Mobile Park & Sandy Hook Bay Marina
Mr. Ricci [the Board's Planner]  both of these property owners are favorable to a zone change. We did talk about a mixed use waterfront development concept in this area which would allow for marina and restaurant related uses which would have a residential component. Mr. Somers of the Paradise Mobile Park has indicated that he wants town homes on his site and under the mixed use scenario we could permit some townhouses but the flavor would be for mixed uses. It is our recommendation to rezone this area a mixed use district. (Emphasis added.)

C
At the time of the Board meeting, Bollerman and Somers were engaged in active pre-contract negotiations, eventually leading to the agreement signed by them on August 26, 2004. Through this contract, Somers made the following representation in Paragraph 11.8:
Other than as set forth herein, Seller has, as of the date of this Agreement, received no written notice, and Seller is not aware, of any condition or requirement of governmental authorities having jurisdiction over the Property which otherwise prohibits the development of the Property, and if Seller receives any such notice or such information prior to closing, Seller agrees to immediately provide Buyer with such information, including a copy of any written notice.
Section 12 of the contract, captioned "Possession," gave the following description of the buyer's right to possession after the closing of title:
No tenant will have any right to the Property unless otherwise agreed in this Agreement. This Agreement is subject to the existing tenancies at the Property, and it is further subject to the condition that all Lease Renewals after the end of the Due Diligence Period shall be on the basis of a month to month tenancy. All new leases shall be no longer than twelve (12) months.
Paragraph 1.2 reflected a reciprocal acknowledgement "that certain encroachments exist from the Property onto the Buyer's adjoining property commonly known as 1 Willow Avenue" and "[s]everal encroachments also exist on Lot 8, Block 102 from the structures located on Lot 7, Block 102." The parties "agree[d] that the Property is being purchased with these encroachments." Despite this language, Somers certified in the present litigation expressing his disagreement with "the encroachment allegations." He agreed to the language in paragraph 1.2 because he "was put in a position where I could not avoid that unless I incurred the expense of continuing litigation and, perhaps, subsequently appealing the title line claim."
Thus, Section 25 of the contract contained the following reference to the then pending encroachment action:

*760 The Buyer and Seller are currently parties in a pending law suit related to the Property entitled, Sandy Hook Developers, LLC v. Riverdale Management Assoc., Superior Court of New Jersey, Law Division, Monmouth County, Docket No. MON-C-320-03. The parties agree that during the pendency of this Agreement, all actions and enforcement of any orders issued in the law suit shall be stayed. Upon the Closing of title, or other settlement between the parties, the law suit shall be dismissed with prejudice.
The contract was subject to a ninety-day due diligence period. On October 21, 2004, approximately two months after the signing of the contract, Bollerman's attorney Gary Edelson wrote Somers's counsel a letter requesting that the due diligence period be extended until February 26, 2005. He offered the following explanation for the request:
In the course of my client's due diligence analysis, it has become apparent that the development of the property is a very complex matter involving numerous federal and state agencies. The two most significant issues relate to federal flood control measures and their requirements as well as New Jersey Department of Environmental Protection regulations. More specifically, the Federal Emergency Management Agency ("FEMA") has re-designated the trailer park as being located in a V-Zone (i.e. costal flooding and wave impact caused by hurricane). Our engineer has stated that "unless the V-Zone designation is removed from the property, residential development of the site will not be permitted". This is because FEMA will revoke the Borough's flood insurance coverage if they allow development within the V-Zone. In addition, the State of New Jersey has a blanket ban on any residential development within the V-Zone. In fact, if the existing trailer park were damaged or destroyed, it probably could not be rebuilt or only a portion of the property could currently be repaired under the V-Zone designation (dependant upon the percentage of damage). FEMA has requested that extensive marine engineering background information be generated and submitted before they will schedule a meeting. Despite the expense of large sums of money and enormous amounts of time, resolution of these very complex issues can only be accomplished through meetings with the various governmental agencies.
Somers's counsel forwarded Edelson's letter to Somers the next day. In response, Somers wrote a letter to his attorney dated October 25, 2004, raising a number of concerns. Specifically, Somers noted that the contractual requirement that he offer only one-year leases after the end of the due diligence period "has created chaos within the park." At least one tenant had removed his home and cancelled "the balance of his lease because of the uncertainty." He expressed doubts that "[p]rospective incoming purchasers," given only the option of a one-year lease, would be willing to spend the substantial funds necessary to become a resident of the Park.
Somers made the following comments with respect to Bollerman's plans for the development of the property:
Lastly, at all times in the correspondence and conversations with Sandy Hook [Developers] and Mr[.] Bollerman and all other proposed purchasers, I was adamant that I was selling a mobilehome park  an operating business and such a sale would be subject to only the normal "due diligence" criteria  Title, tenancies, pollution etc that would be *761 done in any income property. It was made abundantly clear from the outset that there would be no conversation about Planning and Zoning, CAFRA or any other agencies that would need to be consulted to change the use of the property. I pointed out the Statute that requires me to offer the property to the current residents if I offer it for sale in contemplation of a change of use. This letter is asking me to violate that Statute. The "development of the property" is absolutely none of my concern. The "requirements of their lenders" is irrelevant in a cash deal. They represented in the Agreement that they had the cash to close. These issues were discussed, made crystal clear and agreed to in my negotiations with Mr[.] Bollerman prior to executing the contract with "Sandy Hook" and Mr[.] Bollerman was authorized and appointed to execute this agreement. Sandy Hook will be negotiating with FEMA, lenders, contractors, tenants and anyone else they involve while they are operating a very substantial business and enjoying the income from the property. The chaos created by these one year leases is working to the benefit of Sandy Hook in that there will be more vacant spaces and those available for resale will be available at a very reduced price. During this current period, I get aggravation from tenants, prospective purchasers and local realtors on a daily basis. (Emphasis added.)
Bollerman met with Somers on November 18, 2004, and negotiated to extend the due diligence period until January 31, 2005, for the sum of $15,000. After one further postponement, closing of title took place on March 4, 2005. According to Bollerman, throughout the due diligence period, Somers generally responded to any questions about the complexities of the site with the phrase: "It's not my problem," and emphasized that he was selling the property as a "trailer park."
Both seller and buyer presented certifications to the motion judge attesting to their intention to keep the property as a mobile home park. According to Bollerman, he never intended to change the use of the property as a mobile home park because this use was economically sound. As he certified, "the trailer park investments provide good risk adjusted returns and this particular property proved to be a reasonable investment." A ten-year analysis of income developed to support an application to secure financing for the purchase showed that the Park's mobile home operations generated sufficient income to cover debt service.
From the seller's perspective, Somers asserted that the sale price was based upon the income generated by the property as a mobile home park. The contract did not contain any contingencies for development approvals "because it was not a sale in contemplation of changing the use." In fact, he had received and rejected other "significantly higher" offers from other buyers because they included development approval contingencies. He was willing to make less profit from the sale in order to avoid any entanglement in a protracted process of obtaining governmental approvals. As he explained: "Selling it as a mobile home park, I knew, meant selling it for less money. That is what I agreed to. That is what I contemplated." Somers thus candidly admitted that he did not notify any of the Park's residents because he viewed this transaction as exempt under the Act.
Bollerman certified that he first became aware of the existence of the Act in early January 2005, through a conversation with a third-party. He then immediately directed his attorney to research the issue. *762 In response, Edelson wrote a letter to Somers's counsel advising him that the seller's title insurance company required proof of Somers's compliance with N.J.S.A. 46:8C-12. Specifically, Somers had to provide the affidavit of compliance required under N.J.S.A. 46:8C-14 in order to record the deed. Edelson asked that Martin Barger (Somers's attorney) notify him immediately if this was going to be an issue, because the due diligence period would expire on January 31, 2005.
Barger responded with a one-sentence letter dated January 18, 2005, stating that with reference to Edelson's letter, "enclosed herewith find copy of NJSA 46:8C-13 sales or transfers not subject to §§ 46:8C-11 and 46:8C-12, for your review and information." Subsection (a) of N.J.S.A. 46:8C-13 was circled on the attachment. Edelson responded by noting that N.J.S.A. 46:8C-14 required an affidavit of compliance be annexed to the deed as a condition of recordation. He thus requested to see a draft of the affidavit. Edelson also asked Somers's attorney to provide an opinion of counsel letter to memorialize his opinion that the statutory exemption of N.J.S.A. 46:8C-13(a) applied to this sale.
On January 26, 2005, Edelson wrote a memorandum to Bollerman regarding "Paradise Mobile Home Park" and specifically "the law concerning the de-commission of the mobile home park." Edelson advised Bollerman that there was no law granting a right of first refusal to the homeowners "upon taking the mobile home park out of the rental market," but that N.J.S.A. 46:8C-11 granted a right of first refusal "upon the sale of mobile home property" and that "[t]he burden of that notice is placed upon the Seller."
According to Edelson, the title insurance company required proof of compliance with the Act as a condition of closing of title. Accordingly, Edelson requested that the seller prove compliance; the seller responded by claiming exemption pursuant to N.J.S.A. 46:8C-13(a). Edelson also noted the absence of case law interpreting the statutory exemption, specifically the term "contemplation," which left "a great deal of room for interpretation." He further advised:
From our point of view, this is an issue that the Seller needs to address prior to closing. It is not an issue for you from a development perspective. Our current plans are for the property to be developed within the envelope of Navesink Capital Partners. Even if we were to transfer this to another entity for development, we should be covered so long as the new entity is owned by the same or substantially the same parties.
In a letter dated January 27, 2005, Barger made it clear that he would not provide an opinion of counsel letter, by stating: "The statute is clear and your title company should read it. This is merely the sale of a trailer park as stipulated in the Contract." In February 2005, Edelson wrote to Barger regarding numerous pre-closing items including the need for the affidavit required by N.J.S.A. 46:8C-14, which had to be annexed to the deed and recorded by the County Clerk. By letter dated February 16, 2005, Barger advised Somers that he had not notified the residents of the Park of the pending sale.
On March 4, 2005, as part of the documents signed at the closing, the sellers signed an Affidavit of Title stating: "THIS TRANSACTION IS EXEMPT FROM COMPLIANCE WITH NJSA 46:8C-11." In a separate document bearing that same date, Somers provided in part:
2. I hereby submit this Affidavit in compliance with the requirements of N.J.S.A. 46:8C-11, et seq.

*763 3. The Sellers of this property are not required to notify the tenants or any association they may have formed due to the exemption set forth in N.J.S.A. 46:8C-13(a).
4. The sale of this property is not made in contemplation of changing the property to a use other than as a private residential leasehold community.
5. Under the circumstances, notification has not been made nor is it required.

D
On March 5, 2005, an employee of the sellers hand delivered a notice signed by Somers advising some of the residents of the Park that the property had been sold to the Bollerman group. At the time there was no homeowners association in place, or even discussion of creating one. On April 1, 2005, the residents of the Park filed a certificate of incorporation formally creating the Paradise Park Homeowners Association. Three days later, the Association filed a notice of rights under N.J.S.A. 46:8C-16(b), with the office of the Monmouth County Clerk. The notice was formally recorded on April 26, 2005. From May to August 2005, the sellers made several attempts to record the deed. The Clerk's office rejected these attempts because the deed did not contain the affidavit required under the Act. The deed was finally recorded on August 2, 2005.

II
The matter came before the trial court by way of cross-motions for summary judgment. Each side argued that the record described at length here was sufficient to support its position as a matter of law. Plaintiffs argued that the record showed that the buyers purchased the property in contemplation of changing its use as a mobile home park. Plaintiffs argued that from its inception, the buyers showed an interest in developing this site as part of the larger parcel of land comprising the marina area. According to plaintiffs, the encroachment litigation and its settlement, the defendants' efforts to amend the municipal zoning scheme, and the attempts, by both seller's and buyer's counsel, to conceal the true nature of the transaction in order to avoid the notice requirements of the Act, are indicative of the defendants' state of mind.
Defendants countered by emphasizing that the only reliable indicator of the defendants' state of mind during and after the contract negotiations is the contract itself. They asserted that the court's focus should thus be limited to whether the contract contains any indication that a change in the property's use was ever contemplated. According to defendants, the obvious answer to this query is "no."
The motion judge accepted defendants' arguments. Referring first to the exemption in N.J.S.A. 46:8C-13(a), and the affidavit filing requirement under N.J.S.A. 46:8C-14, the court then reasoned as follows:
[T]he contemplation of the parties is not just what the parties to the transaction will tell the Court they intended. Instead it is also reflected by the contract as well as the consideration paid at closing.
Here, the consideration paid at closing was identical to that provided for in the contract. As such, the contract was clearly not a ruse for a different deal. Instead as indicated by the certification filed by various defendants, the contract was based upon the sale of the property as a mobile home park, in addition to that, settling other pieces of litigation. In fact, it was valued on that basis. *764 Thus the Court takes judicial notice of the fact that the potential use for which the land can be put will determine its value. The subject trailer park or mobile home park was not based upon the sale of 3.77 acres of waterfront property free of any possessory rights of Paradise Park residents which could be developed for some alternative use. If that was the case, it would be much more valuable.
....
In addition to that, I accept the certifications everyone filed saying that they have no intention of changing the use, no intention of doing anything further. Mr. Bollerman's business plan, because of what he owns around it, is an intelligent business plan. And he also bought the property to get rid of a bunch of other legal problems and in essence quiet title. If I thought for one minute there was one scintilla of evidence here that they were trying to do this deal to circumvent the law, I would not be making the decision that I am making here today. There is no evidence in this record anywhere that that was the case. It is clear to me from the consideration paid and the language of the contract that that's not the case.
In addition to that, the new law that was quoted by Mr. Hanlon clearly points out that it's almost impossible for the people from Paradise Park to be relocated under a change of use for any use, whether it be commercial or residential. Importantly, there is no doubt that while the municipality was thinking about a zoning change and made a zoning change, that clearly the rights of the residents have been protected.
Instead the proper question before the Court is whether or not the actual sale was made in contemplation of a zoning change. The defendants assert that without consideration being paid for the land being usable as the basis of that change, such change in use is nothing but speculation. Here it is nothing but speculation. There is not one indication in this record at all that there's going to be a change of use.
Instead the statute is clear that it calls for the Court to analyze the deal to determine whether or not the transaction is exempt. The seller's intent is dispositive not because he says so but because he gets paid based on his intent, because he certified to me what his intent was and therefore since the contract is reflective of the seller's intent and I accept his unrefuted statement, it is dispositive here.
Referring to other state and local laws, specifically N.J.S.A. 2A:18-61.1 of the Anti-Eviction Act, the court devoted a significant amount of its analysis emphasizing how Paradise Park residents are otherwise protected from displacement, even if they were not the beneficiaries of the Act's right of first refusal.

III
Our analysis of the legal issues raised by the parties requires us to first identify the overarching public policy principles proclaimed by the Legislature when it adopted the Mobile Home Protection Act. As is the case with similar remedial legislation, e.g., the Anti-Eviction Act, N.J.S.A. 2A:18-61.1 to -61.12, we are required to construe the provisions of this Act "liberally" in order "to effectuate the purposes thereof." N.J.S.A. 46:8C-7; see also 447 Associates v. Miranda, 115 N.J. 522, 529, 559 A.2d 1362 (1989). In this analytical paradigm, "`[t]he reason and spirit of the statute controls in its interpretations.'" Maglies v. Estate of Guy, 193 N.J. 108, 123, 936 A.2d 414 (2007) (quoting *765 Schierstead v. Brigantine, 29 N.J. 220, 231, 148 A.2d 591 (1959)).
Although not expressly stated in its text, it seems clear that the Legislature adopted the Act to promote and enhance the ownership of mobile home parks by the residents of such parks. Toward that end, the Act provides for the formation of self-governing boards or associations by mobile home owners. N.J.S.A. 46:8C-15. Continuation of the use of park lands for such purposes is the indispensable adjunct driving this public policy. Judicial review of individual statutory sections of the Act must, therefore, be guided and informed by these two overarching legislative policies: (1) to continue the use of mobile home parks on lands currently used for such a purpose; and (2) to encourage and promote ownership and self-governance by the residents of these parks.
To achieve these goals, the Legislature imposed an obligation upon the owner of a mobile home park to notify the board of directors of the mobile home owners' association if he/she "offers" the park property for sale.[5]N.J.S.A. 46:8C-11(a). Such notice must include the price, and "the terms and conditions of sale." Ibid. Thereafter, "[t]he affected homeowners, by and through an association duly formed in accordance with [N.J.S.A. 46:8C-15], shall have the right to purchase such land . . ." N.J.S.A. 46:8C-11(b). (Emphasis added).[6]N.J.S.A. 46:8C-12(a) establishes a similar notification procedure and right of first refusal if the park owner "receives a bona fide offer to purchase the land." (Emphasis added).
Against this backdrop, we now turn to N.J.S.A. 46:8C-13. Denoted as "sales or transfers not subject to §§ 46:8C-11 and 46:8C-12," this statute delineates a total of twelve separate transactions or transfers of title that are exempt from the right of first refusal provisions discussed herein. These are the exemptions:
a. Any sale or transfer of the property of a private residential leasehold community which is not made in contemplation of changing that property to a use or uses other than as a private residential leasehold community.
b. Any sale or transfer to a person who would be included within the table of descent and distribution if the landowner were to die intestate.
c. Any transfer by gift, devise, or operation of law.
d. Any transfer by a corporation to an affiliate. As used herein, "affiliate" means (1) any shareholder exercising control, or control through attribution as defined under section 318 of the Internal Revenue Code, of the transferring corporation; (2) any corporation or entity owned or controlled, directly or indirectly, by the transferring corporation; or (3) any other corporation or entity owned or controlled, directly or indirectly, by any shareholder of the transferring corporation. For the purposes of this subsection, control shall mean control as defined in section 304 of the Internal Revenue Code.
e. Any transfer by a partnership to any of its partners, whether general partners or limited partners, or partners or *766 individuals to a corporation where the control of the corporation is substantially the same.
f. Any conveyance of an interest in a private residential leasehold community incidental to the financing of that community.
g. Any conveyance resulting from the foreclosure of a mortgage, deed of trust, or other instrument encumbering a private residential leasehold community, or any deed given in lieu of such foreclosure.
h. Any sale or transfer between or among joint tenants or tenants in common owning a private residential leasehold community.
i. The purchase of land of a private residential leasehold community by a governmental entity under its powers of eminent domain.
j. Any sale which occurs as a result of a condominium or cooperative conversion.
k. Any sale of real estate owned by the private residential leasehold community landowner which is adjacent to the private residential leasehold community land, but does not have appurtenant to it private residential leasehold sites or spaces or related recreational facilities.
[N.J.S.A. 46:8C-13.]
A consistent theme running throughout these exemptions is that none of the transfers or conveyances carry a significant risk of changing the property's use to something other than as a mobile home park. That is, if properly carried out in good faith, none of these transactions undermine the Legislature's commitment to encourage park-ownership by mobile home residents, and self-governance in mobile home communities.
Good faith is the linchpin of this analysis. If courts permit interested parties to utilize these statutorily recognized transactions as legislative loopholes, i.e., as a means of circumventing the procedural and substantive rights bestowed to mobile home park residents in N.J.S.A. 46:8C-11 and N.J.S.A. 46:8C-12, then the public policy rationale embodied in the Act is frustrated.
We now turn our attention to the facts here. The record shows that Somers received a bona fide offer to purchase Paradise Park from Bollerman sometime after June 23, 2004, (the date Bollerman prevailed in the encroachment action), but before August 26, 2004, (the date the contract was fully executed).
Without more, the events described above would have triggered plaintiffs' rights of notification and first refusal under N.J.S.A. 46:8C-12(a). Thus, when a park owner receives a bona fide offer to purchase, (as Somers did here from Bollerman) it automatically triggers the notice requirements in N.J.S.A. 46:8C-12(a). However, relying on the provisions in N.J.S.A. 46:8C-13(a), defendants argue that Somers was relieved from his obligation under N.J.S.A. 46:8C-12(a) to notify the Park's residents that he had received an offer to purchase from Bollerman because the sale was not made "in contemplation" of changing the property's use as a mobile home park.
Specifically, N.J.S.A. 46:8C-13(a) provides that:
The provisions of [N.J.S.A. 46:8C-12(a)] of this act shall not apply to:
a. Any sale or transfer of the property of a private residential leasehold community which is not made in contemplation of changing that property to a use or uses other than as a private residential leasehold community. (Emphasis added).
*767 The park owner has the burden to prove entitlement to this exception. The statute makes that clear as it otherwise places the burden of complying with the statute on the park owner to notify the homeowners of their right to purchase the park, N.J.S.A. 46:8C-11, and to certify as to the non-applicability of the general rule. N.J.S.A. 46:8C-14. We therefore hold that Somers, as the seller, bears the burden in this litigation of showing that this transaction falls within the exemption delineated in N.J.S.A. 46:8C-13(a). He must prove that the sale was not made "in contemplation of changing that property to a use or uses other than as a private residential leasehold community." To make this determination, we must first construe the phrase "in contemplation."
The means used by courts to accomplish this task are well-settled. In interpreting a statute, we must determine the Legislature's intent. D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 119, 927 A.2d 113 (2007). To determine that intent, we start with the plain language of the statute, and "ascribe to the statutory language its ordinary meaning." Ibid. "If the plain language leads to a clear and unambiguous result, then our interpretive process is over." Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195, 927 A.2d 543 (2007); Patel v. N.J. Motor Vehicle Commission, 403 N.J.Super. 373, 376, 958 A.2d 481 (App.Div.2008).[7]
We start our discussion by distinguishing "contemplation" from intent. We are satisfied that the term "contemplation," as used in N.J.S.A. 46:8C-13(a), is not synonymous with "intent." The legal concept of "intent" encompasses a firm mental commitment to carry out a given plan or course of action. See Black's Law Dictionary, (7th ed. 1999). By contrast, "contemplate" connotes a less committed state of mind. To contemplate is to consider or ponder the feasibility of bringing something to fruition. Webster's II New College Dictionary (1995). In short, "contemplation" lacks the resolve of "intent."
Although the statute is silent on the question of how a reviewing court should assess the state of mind of the seller, when an exemption under N.J.S.A. 46:8C-13(a) is invoked, we are satisfied that such an assessment must be made using an objective standard. We reach this conclusion because a subjective standard would leave open avenues for potential mischief, undermining the policy goals underpinning the Act.
Thus a court assessing the viability of this defense must do so by applying an objective standard of review. In order to invoke the exemption in N.J.S.A. 46:8C-13(a), a court must determine whether a reasonably prudent person in the seller's position would have a rational, good faith basis to believe that the sale was not made "in contemplation" of changing the use of the property.
Stated differently, a seller's point of reference informing his or her belief that the sale is not made in contemplation of changing *768 the property's use cannot be exclusively based on the attendant circumstances existing at the time he or she receives a bona fide offer to sell. The reasonableness of a seller's belief that the sale is exempt under N.J.S.A. 46:8C-13(a) must necessarily be dependent upon all of the attendant circumstances surrounding the parties' negotiations leading to the execution of the final contract, up to and including the date of closing of title, when presumably the seller delivers to the buyer a duly executed affidavit of compliance as required under N.J.S.A. 46:8C-14.
Returning to the facts here, we are satisfied that plaintiffs presented sufficient evidence from which a rational factfinder could find that the sale of this property was made "in contemplation" of changing its use to something other than a mobile home park. We also hold that the trial court improperly narrowed the focus of its analysis to the "four corners" of the written contract between Bollerman and Somers, thereby ignoring a wealth of probative evidence of defendants' state of mind concerning the future use of the Park property. This evidence includes, but is not limited to:
The Consideration Paid by Buyer: Bollerman instructed his attorney, immediately after he prevailed on the liability part of his encroachment action, to negotiate a contract with Somers using this legal victory as leverage. This resulted in a settlement of the damages part of the case, which was ultimately incorporated into and made an express part of the contract for sale.
As argued by plaintiffs, this undermines one of defendants' principal arguments; namely, that the consideration reflected in the contract is consistent with the continuing operation of the Park as a mobile home community. Expert testimony may provide a basis to quantify the value the settlement added to Somers's contract, as well as the amount of damages to which Bollerman would have been entitled to if Somers was physically unable to remove the encroachment. These factors could affect the actual consideration Bollerman paid for the property.[8]
The Lobbying Activities of Seller and Buyer: The record shows that during contract negotiations, and even after the signing of the final agreement, both Bollerman and Somers engaged in conduct which can be fairly characterized as lobbying to change the municipal zoning code to permit the development of the property for a use other than as a mobile home park. In his letter to the Borough of Highlands Planning Board, Somers urged this body to amend the municipal master plan to permit the development of the Park for other types of residential dwelling. Bollerman testified before the Planning Board urging a similar outcome. Although both Bollerman and Somers deny that these efforts were indicative of their state of mind with respect to any future plans to change the use of the property, a reasonable factfinder could conclude otherwise.
Correspondence of Counsel: Plaintiffs argue that the series of letters written by Bollerman's counsel to Somers's counsel, together with Somers's response thereto, constitute "smoking gun" evidence of the parties' state of mind concerning changing their plan for developing the Park property, and the agreement reached to conceal such intent by not mentioning it in the text of the contract, thereby avoiding compliance with the Act's notice requirement under N.J.S.A. 46:8C-12(a). Specifically, during the pendency of the contract's *769 due diligence period, Bollerman's counsel wrote to Somers's counsel requesting additional time to investigate a number of State and federal regulatory issues affecting the future development of the property. The letter reads, in pertinent part: "In the course of my client's [Bollerman] due diligence analysis, it has become apparent that the development of the property is a very complex matter involving numerous federal and state agencies." (Emphasis added).
Somers's response to Bollerman's counsel includes the following statement:
It was made abundantly clear from the outset that there would be no conversation about Planning and Zoning, CAFRA or any other agencies that would need to be consulted to change the use of the property. I pointed out the Statute that requires me to offer the property to the current residents if I offer it for sale in contemplation of a change of use. This letter is asking me to violate that Statute.
Following this letter and further face-to-face negotiations, Somers agreed to extend the due diligence period in exchanged for $15,000. The contract does not contain any references to development contingencies.
According to plaintiffs, these letters and subsequent negotiations leading to the extension of the due diligence period are probative of the parties' true state of mind with respect to the future development of the Park property. Plaintiffs argue that the trial court's dismissal of this evidence in the context of deciding to grant defendants' motion for summary judgment amounted to reversible error.

IV
We agree with plaintiffs' position. A trial court's grant of summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2. In determining whether there exists a "genuine issue" of material fact precluding summary judgment, the motion judge must consider whether the competent evidential materials presented, viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve any disputed issue in favor of the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). The motion judge is not permitted to weigh the evidence and determine the truth of the matter. Ibid. On appeal, we apply the same standard when reviewing summary judgment orders. Block 268, LLC v. City of Hoboken Rent Leveling & Stabilization Bd., 401 N.J.Super. 563, 567, 952 A.2d 473 (App.Div.2008).
Here, in deciding defendants' motions for summary judgment, the trial court was bound to resolve all of the available evidence in the light most favorable to the non-moving party. Brill, supra, 142 N.J. at 540, 666 A.2d 146. Based on the evidence presented by plaintiffs, the trial court should have denied defendants' summary judgment motions and scheduled the case for trial.
Plaintiffs are similarly not entitled to summary judgment. Although an inference can be drawn that Somers did sell the Park in contemplation of a change in use, the same evidence also supports a contrary inference. Consequently, because on summary judgment we evaluate plaintiffs' arguments by drawing all inferences in favor of defendants, Brill, supra, 142 N.J. at 540, 666 A.2d 146, reasonable minds could *770 differ and plaintiffs are not entitled to summary judgment.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] At the time the complaint was filed, Edelson was a suspended attorney. In re Edelson, 185 N.J. 328, 885 A.2d 950 (2005). He has since been disbarred. In re Edelson, 188 N.J. 282, 906 A.2d 1116 (2006).
[2] Navesink Capital Partners was created in 2005 for the purpose of purchasing Paradise Park.
[3] Plaintiff Loretta Dibble obtained a copy of the letter from the Borough records through a formal request under the Open Public Records Act. N.J.S.A. 47:1A-1 to -13.
[4] Dibble's account of what transpired at this Planning Board meeting of June 10, 2004, was based on her listening to the audio recordings of the session. We are unable to resolve the conflict in the parties' version of events because we were not provided, as part of the appellate record, with a transcription of the recording of the meeting. The official minutes of the Board provide only a cryptic account of what transpired.
[5] In the event that a homeowners association has not been created at the time a park owner receives a bona fide offer to purchase, the Act requires the park owner to notify each individual resident of the park personally. N.J.S.A. 46:8C-15. The residents have a specified time period to respond to the park owner, individually, or through a newly established homeowners association. Ibid.
[6] Beyond these preliminary steps, the land owner is required to notify the resident association in the event counteroffers are made or considered. N.J.S.A. 46:8C-11(c).
[7] Ordinarily, we would also rely on legislative history in the form of committee reports or statements, or studies considered by the Legislature. Our research has not uncovered this information. We are satisfied, however, that the New Jersey version of the Act is based on a model statute proposed by the American Association of Retired Persons (AARP). The model law was part of a report commissioned by the AARP and written by the National Consumer Law Center in 2004 titled: "Manufactured Housing Community Tenants." Based on the findings contained in the AARP report, the section at issue here, N.J.S.A. 46:8C-13(a), containing the exemption for a sale that was not made "in contemplation" of changing the use of the property, appears to be unique to New Jersey.
[8] In his certification in support of his summary judgment motion, Bollerman characterized the cost of remediation required from Somers as a "staggering expense."